## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL FAJARDO, Individually and On Behalf of All Others Similarly Situated, | )<br>)<br>) **Case No.**<br>) |
| Plaintiff, | )<br>) |
| v. | ) **CLASS ACTION COMPLAINT**<br>) |
| MACQUARIE INFRASTRUCTURE CORPORATION, JAMES HOOKE, JAY DAVIS, LIAM STEWART, and RICHARD D. COURTNEY, | ) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## CLASS ACTION COMPLAINT

Plaintiff Daniel Fajardo ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Macquarie Infrastructure Corporation ("Macquarie" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Macquarie's securities

1

between February 22, 2016 and February 21, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Macquarie Infrastructure Corporation owns, operates, and invests in a portfolio of infrastructure businesses. The Company's businesses consist of bulk liquid terminals, airport services, gas processing and distribution, and a portfolio of contracted power and energy investments.  Macquarie's International-Matex Tank Terminals ("IMTT") business provides bulk liquid storage and handling services at 12 marine terminals in the United States and Canada, is Macquarie's most important business segment.

3.     Founded in 2004, the Company is headquartered in New York, New York, and its stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MIC."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) IMTT's performance and utilization were at risk of significant decline due to ongoing industrywide changes in the market for heavy residual oils, and in particular, declining demand and pricing for No. 6 fuel oil; (ii) IMTT relied significantly on demand for storage of heavy residual fuel oils, including No. 6 fuel oil; (iii) Macquarie needed to undertake significant capital expenditures to repurpose IMTT storage tanks to accommodate alternative products; and (iv) as a result of the foregoing, Macquarie's shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

2

5.      On February 21, 2018, after the market closed, Macquarie surprised the market by announcing disappointing fourth quarter earnings of $0.43 per share, well short of analysts' estimate of $0.51 per share, and that the Company would be slashing its dividend by 31%. Macquarie blamed its poor performance on the declining use of heavy residual oil products, in particular, declining demand and prices for No. 6 fuel oil.

6.      On this news, Macquarie's share price fell $26.21, or 41.19%, to close at $37.41 on February 22, 2018.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Macquarie conducts substantial business in this Judicial District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this Judicial District.  Also, Macquarie's principal executive offices are located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Macquarie securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Macquarie is incorporated in Delaware, with principal executive offices located at 125 West 55th Street, Floor 15, New York, New York 10019.   Macquarie's securities trade on the NYSE under the ticker symbol "MIC."

14.     Defendant James Hooke ("Hooke") served as the Company's CEO from July 2014 to December 31, 2017.

15.     Defendant Jay Davis ("Davis") has served as the Company's Head of Investor Relations and Vice President since March 2008.

16.     Defendant Liam Stewart ("Stewart") has served as the Company's Chief Financial Officer ("CFO") and Vice President since June 30, 2015.

17.     Defendant Richard D. Courtney ("Courtney") has served as the CEO of IMTT since February 2015.

18.     The Defendants referenced above in ¶¶ 14-17 are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Macquarie's SEC filings, press releases, and other market communications. The

Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Macquarie Infrastructure Corporation owns, operates, and invests in a portfolio of infrastructure businesses. The Company's businesses consist of its IMTT business, a bulk liquid terminals business, airport services, gas processing and distribution, and a portfolio of contracted power and energy investments.

21.     IMTT is the most important of Macquarie's business segments. During the Class Period, IMTT generated the lion's share of Macquarie's revenues and income. According to Bloomberg, in 2017 Macquarie's IMTT business constituted over 30% of the Company's revenues and nearly 70% of its net income.

22.     On July 7, 2014, Macquarie announced it had entered into an agreement to acquire the remaining 50% stake in IMTT still owned by IMTT's founders, giving the Company full ownership and control of IMTT. Macquarie announced it acquired a business with a "strong foundation" that provided shareholders with "a number of potentially significant benefits," including "enhanced dividend growth" and "better visibility into growth in distributable cash

flow." After the announcement of the IMTT buy-out, Defendant Hooke, the Company's then-CEO, declared that the acquisition would "fortify MIC's stable, largely contracted revenue based business model." Thereafter, Macquarie continued to tout the strength of the IMTT business, including its lack of exposure to any one commodity. Defendants specifically denied suggestions that IMTT's high utilization rates were at risk due to macroeconomic trends and pressures in the oil industry. For example, on October 30, 2014, responding to an analyst question about the impact of lower oil prices on the IMTT business, Hooke stated that impact would be minimal because "we just don't have commodity exposure."

23.     Consistent with its prior statements, throughout the Class Period, Macquarie repeatedly touted IMTT's "very strong" performance and "high" utilization rates. Defendants maintained that any declines in IMTT's storage utilization were temporary and due only to routine maintenance, such as tank cleaning and inspection. Without disclosing the specific commodities stored at IMTT's facilities, Defendants assured investors that IMTT's business was not vulnerable to structural changes in commodity usage, including the market for refined petroleum products. Defendants further assured investors that the Company's historically high dividend was safe and sustainable.

**Materially False and Misleading Statements Issued During the Class Period**

24.     The Class Period begins on February 22, 2016, when Macquarie issued a press release announcing its financial results for the fourth quarter and full year of 2015. In the press release, which was filed with the SEC on Form 8-K the following day, the Company announced a dividend of $1.15 per share for the fourth quarter. The press release noted that Macquarie's total dividends in 2015 increased 14.7% compared to 2014, and that the Company had increased its dividend in each of the last nine quarters. In addition, Defendant Hooke noted that the

dividend also surpassed the Company's guidance, stating that the Company's "growth has been achieved despite the volatility in markets broadly and reinforces a basic premise of infrastructure – namely, that it is an inherently more stable asset class."

25.     In the press release, Defendant Hooke also emphasized the strength of the Company's IMTT business. Hooke told investors that "[t]he performance of IMTT in both the quarter and the full year periods reflects the downstream services nature of the business overall, as well as the extent to which it is uncorrelated with the exploration and production (E&P) portion of the oil industry . . . . IMTT saw no signs of counter-party distress during 2015." The press release stated that IMTT had experienced "improvements in firm commitments including increased utilization rates of 94.9% at year end of 2015."

26.     The next day, February 23, 2016, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2015 ("2015 10-K"). In the 2015 10-K, the Company reported total revenue of $1.639 billion and net income loss of $113.807 million, which included IMTT total revenue of $550 million and IMTT net income of $74.14 million. The 2015 Form 10-K minimized the impact to IMTT of any volatility in petroleum prices, stating that: "[U]ncertainty among industry participants generally has led to a reduction in the average duration of storage and related services contracts. While the shortening of contracts results in a modest increase in re-contracting risk, the essential services nature of the business and continued strong demand for the products stored serves to offset this risk." The Company's 2015 10-K further stated that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

27.     The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Hooke and Stewart, stating that the financial information

contained in the 2015 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Company."

28.     Also on February 23, 2016, during an earnings call, Defendant Hooke highlighted the stability of IMTT utilization rates, noting that IMTT's utilization rates remained high and were not sensitive to market fluctuations, particularly within the petroleum market: "[U]tilization remains high, firm commitments are up, and the cold snap in the Northeast, shortlived though it was, was a mild positive from a heating revenue point of view. But none of this should come as a huge surprise. This is not a business that is sensitive to what is going on in the exploration and production, or in interstate product movement. It is a business that has some sensitivity to enduser demand, but least in the petroleum segment of its operations." Defendant Hooke stated that IMTT was "seeing growth in end user demand" and emphasized that "IMTT is likely to continue to perform well and continue to serve as a platform for capital deployment." He further touted as the strength of IMTT its lack of exposure to any one commodity: "In short, we feel confident in the continued stable contribution from IMTT to our overall results. The Business is simply not the macro economically sensitive enterprise that has been implied in the strong correlation of our share price with those in the MLP world."

29.     During the Company's May 12, 2016 Investor Day conference, Defendant Courtney continued to highlight the stability of IMTT's utilization rates, and dispelled concern regarding market changes impacting the demand for heavy residual oils: "Most of the problems that are happening right now is affecting the upstream, crude, exploration and the gathering. For us, we are kind of downstream. Our assets are in a different part of the logistics and distribution chain."

30.     On August 30, 2016, during the Three Part Advisors Midwest IDEAS Investor Conference, Defendant Davis continued to downplay the significance of petroleum IMTT, and the effect that changes in the petroleum market would have on IMTT. Davis emphasized that IMTT "stores and handles a variety of refined petroleum, chemical and vegetable and animal oils." Davis added that IMTT "is a downstream business, we are dealing in refined products and demand for refined products has likely been quite strong. So this business has performed well throughout this period of time. Bear that in mind when you see anomalous moves in the share price." Defendant Davis further explained that "[d]emand for storage is high, as you can imagine. You read about it every day usually in the context of crude oil but also as it pertains to refined product." He also explained that an IMTT utilization rate between 94% and 96% is "normal."

31.     On February 21, 2017, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2016 ("2016 10-K"). The 2016 10-K reported total revenue of approximately $1.6 billion and net income of $154 million, and total IMTT revenue of $532.5 million and net income of $83.1 million, which constituted more than 32% and 53%, respectively, of the Company's total revenue and net income. Regarding IMTT, the Company again represented that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT." The 2016 Form 10-K further emphasized the stability of IMTT customers, noting that IMTT's customers are "investment grade" and operate under "fixed periodic payment" contracts with IMTT: "For the year ended December 31, 2016, approximately 55% of IMTT's revenue was generated by its top ten customers of which seven were rated as investment grade and the other three were not rated. Customers typically sign contracts which, among other things, provide for a fixed periodic payment (usually monthly) for

access to and use of IMTTs facilities. . . . These amounts are payable whether the customer uses the facilities or not."

32.     The 2016 10-K contained signed certifications pursuant to SOX by Defendants Hooke and Stewart, stating that the financial information contained in the 2016 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Company."

33.     The next day, on February 22, 2017, Macquarie held its earnings conference call for the 2016 fiscal year end, during which Defendant Hooke discussed IMTT's utilization rates and stability, and informed investors that IMTT's "utilization remained very strong," and "[s]torage prices were stable, with pricing on renewal stepping up in line with inflation." According to Hooke, "[u]tilization remained at the high end of historically normal levels at 96.4% at year end." During the call, Defendants again assured investors that fluctuations in the petroleum market would not impact IMTT. In response to an analyst question regarding whether IMTT "pricing expectations and negotiations for the asset going forward changed incrementally at all[,]" and whether IMTT utilization was reverting to historic mean levels "because of new storage capacity coming on in the South," Defendant Hooke represented that IMTT utilization rates "will revert to historically normal levels . . . because things generally revert to historically normal levels. There's nothing we see coming down the pipe that says that this is why we'll revert to historically normal levels. It's just that eventually things will revert to the mean. I would say that's where it's at." Hooke further stated that "we have every incentive to keep those tanks as full as we can, and we will."

34.     Similarly, at the Oppenheimer Industrial Growth Conference on May 10, 2017, Defendant Davis stated that "utilization rates are at very high levels" and would remain high into

2018 because "the basic services nature of this business – its capital intensity and the very high barriers to entry into this business – provide us with good visibility into its cash generation and opportunities for growth over time."

35.     One week later, on May 18, 2017, at the Three Part Advisors East Coast IDEAS Investor Conference, Defendant Davis reiterated that "utilization rates have remained very, very high, and they're currently over 96%, which is to say we don't have space for anything else at this point in time." Davis emphasized to investors that the Company maintains "good visibility" into "macroeconomic factors influencing supply and demand more broadly," as evidence of IMTT's stability. Davis also stated that utilization rates would remain high into 2018 because "the basic services nature of the business gives us good visibility," and that IMTT facilities have "no commodity exposure directly" because they "simply provide[] access to storage capacity."

36.     On June 27, 2017, at the JPMorgan Energy Equity Investor Conference, Defendant Stewart continued to represent that "utilization for us remains at the high end of historical range" and "the market is one that's in relative equilibrium at the moment." He explained that IMTT "benefit[s] from stable, generally growing demand and typically very favorable competitive dynamics." And "[t]he effective execution of this strategy has led to attractive levels of growth in cash generation, dividends and the MIC share price. Each of free cash flow and dividends have grown at a midteens pace over the past 5 years." Thus, Stewart informed investors that the Company's "guidance for 2017, shown here at the midpoint for free cash flow and forecast 10% for dividends, is wholly consistent with our historic performance."

37.     During an August 3, 2017 earnings call, Defendant Hooke addressed IMTT's exposure to fluctuations in the petroleum market. Dismissing an analyst's question about whether "there are any commodity-driven factors that would cause a decline in utilization,"

Hooke assured investors that IMTT's utilization was stable and essentially immune from fluctuations in commodity markets: "No, no. The totality of the change in utilization was driven by tanks offline for tank cleaning and inspection. But the other I would – so there's no – well, there's nothing – there's no other commodity noise or other noise or counter-party issues there. It's purely that." Defendant Hooke noted that "IMTT's operating results for the second quarter were a case of steady as she goes, a reversion to the mean in storage utilization, stable pricing and one small construction project termination that resulted in recognition of some deferred revenue."

38.     On August 31, 2017, at the Three Part Advisors Midwest IDEAS Investor Conference, Defendant Davis likewise stated that "utilization has been very, very stable. Generally speaking, where we are today at about 94% in utilization is consistent with historically normal." And speaking to the Company's stability and the sustainability of its dividend, Davis emphasized that "what you've got there is a stable and growing cash generation from some very basic services kind of businesses where we're being traded today, of course, I think most people would suggest is an attractive yield leading to that mid- to high-teens kind of a total opportunity – total return kind of an opportunity, very much consistent with what we've been doing for the past 13 years."

39.     On November 1, 2017, when Macquarie filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 10-Q"). The Q3 2017 10-Q stated that Macquarie was issuing a quarterly dividend of $1.42 per share, representing a 10.1% increase over the dividend offered during the prior year period. The Company also reported total revenue of approximately $453 million and net income of $36 million, and IMTT total revenue of approximately $134

million and net income of $20 million, which constituted more than 29% and 57%, respectively, of the Company's total revenue and net income. Regarding IMTT, the Company's 2017 3Q Form 10-Q echoed Macquarie executives' repeated representations about IMTT's high utilization rates and stability: "We expect utilization levels to be approximately 94% over the long term, as they have been historically."

40.     The Q3 2017 10-Q contained signed certifications pursuant to SOX by Defendants Hooke and Stewart, stating that the financial information contained in the Q3 2017 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

41.     During an earnings call the following day, on November 2, 2017, Macquarie held a conference call with analysts and investors to discuss the Company's Q3 2017 10-Q. According to Defendant Hooke, the "primary driver" in a slight drop in IMTT utilization in the third quarter of 2017 was that "[t]wo of these tanks were out of service for a portion of the third quarter . . . ." Hooke instructed investors to "keep in mind that the decline in utilization was not outside the historically normal utilization range of between 92% and 94%." Hooke also emphasized the Company's conservative dividend policy, stating that "I think across the period I've been here, you've never seen us make radical lurching changes of, sort of, revisiting capital policy and dividend policy, et cetera. I would be pretty surprised if anything changes going forward." And in response to a question as to whether Macquarie will follow the market "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow and having stronger financials," Hooke assured investors that:

> I don't think you'll see us imitate too many others over time. I think our view is
> fads come and go as to what's popular. Exuberant dividend growth at all costs
> where people were urging us to guide to 7 years' visibility of 20% plus dividend
> growth, we never did that. People slashing their dividend saying we're going to

slash our dividend to deploy capital internally, I don't think you'll see us do that. I don't think we will get into any of those fads. I would say that some of the midstream firms are sort of having to take, today, some pain for some decisions they've taken in the past that we haven't taken. Remember that sort of 60% of our business or so is not midstream.

42.    Similarly, during the November 16, 2017 Three Part Advisor Southwest IDEAS Investor Conference, Defendant Davis stated that IMTT's utilization rates were stable, noting that the "basic nature of this business, combined with inflation-linked escalators in those contracts, . . . provide us with very good visibility into the cash generating capacity of this business over a longer period of time." Davis also emphasized the Company's history of authorizing "pretty consistent increases in the dividend," noting that the Company typically returns "between 75% and 85% of the cash produced" as a quarterly cash dividend.

43.    The statements referenced in ¶¶ 24-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) IMTT's performance and utilization were at risk of significant decline due to ongoing industrywide changes in the market for heavy residual oils, and in particular, declining demand and pricing for No. 6 fuel oil; (ii) IMTT relied significantly on demand for storage of heavy residual fuel oils, including No. 6 fuel oil; (iii) Macquarie needed to undertake significant capital expenditures to repurpose IMTT storage tanks to accommodate alternative products; and (iv) as a result of the foregoing, Macquarie's shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

**The Truth Begins to Emerge**

44.    On February 21, 2018, after the market closed, Macquarie surprised the market by announcing disappointing fourth quarter earnings of $0.43 per share, well short of analysts' prior

14

estimate of $0.51 per share, and that the Company would be slashing its dividend. The Company

cited as the main reason for its poor performance the loss of "half a dozen" IMTT contracts at its

flagship Louisiana storage facility due to a decline in the No. 6 fuel oil segment. This was the

first time the Company had disclosed the importance of the No. 6 fuel oil segment to the IMTT

business, and to the Company's overall performance.

45.    Company executives attempted to downplay the loss of these IMTT customers as

"an issue having to do with one product, in one market, in one of our businesses." But the

broader significance of the decline in No. 6 fuel oil to Macquarie's long-term business was made

clear: Macquarie announced that it would be cutting its 2018 dividend by 31% to strengthen the

Company's balance sheet and fund key business projects, primarily the repurposing of IMTT

fuel tanks to accommodate new products. As the Company's current CEO acknowledged on

February 22, 2018, the Company was "better off repurposing these 6 Oil tanks now, given the

long-term structural decline of this product."

46.    On this news, Macquarie's share price fell $26.21, or 41.19%, to close at $37.41

on February 22, 2018.

47.    As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Macquarie securities during the Class Period (the "Class"); and were

damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are

Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Macquarie securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Macquarie or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Macquarie;

- whether the Individual Defendants caused Macquarie to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Macquarie securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

54.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Macquarie  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Macquarie securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

18

Macquarie securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Macquarie securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Macquarie securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Macquarie's finances and business prospects.

61.      By virtue of their positions at Macquarie, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers

and/or directors of Macquarie, the Individual Defendants had knowledge of the details of Macquarie's internal affairs.

63.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Macquarie.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Macquarie's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Macquarie securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Macquarie's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Macquarie securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

64.     During the Class Period, Macquarie securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Macquarie securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff

and the Class, the true value of Macquarie securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Macquarie securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

67.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.    During the Class Period, the Individual Defendants participated in the operation and management of Macquarie, and conducted and participated, directly and indirectly, in the conduct of Macquarie's business affairs.  Because of their senior positions, they knew the adverse non-public information about Macquarie's misstatement of income and expenses and false financial statements.

69.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to

Macquarie's financial condition and results of operations, and to correct promptly any public statements issued by Macquarie which had become materially false or misleading.

70.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Macquarie disseminated in the marketplace during the Class Period concerning Macquarie's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Macquarie to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Macquarie within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Macquarie securities.

71.     Each of the Individual Defendants, therefore, acted as a controlling person of Macquarie.   By reason of their senior management positions and/or being directors of Macquarie, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Macquarie to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Macquarie and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Macquarie.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 27, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein

60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

Submission Date

2018-04-25 10:17:34

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.     I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Macquarie Infrastructure Corporation ("Macquarie" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Macquarie securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Macquarie securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Macquarie securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

## Name

Print Name

Daniel Fajardo

## Acquisitions

Configurable list (if none enter none)

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 10/27/17 | 50 | 70.3490 |

## Sales

Configurable list (if none enter none)

| Date Sold | Number of Shares Sold | Price per Share Sold |
|---|---|---|

| none | none | none |
|------|------|------|

## Documents & Message

Upload your brokerage statements showing your individual purchase and sale orders.

(redacted)



Signature



Full Name

Daniel Daniel Fajardo

(redacted)

**MACQUARIE INFRASTRUCTURE CORPORATION (MIC)**                    **Fajardo, Daniel**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 10/27/2017 | Purchase | 50 | $70.3490 |